UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LUZ QUERY AND LANCE QUERY<br>Plaintiffs, | * | CASE NO.: 2:24-CV-02082 |
| VERSUS | * | JUDGE FALLON |
| COSTCO WHOLESALE CORPORATION CARROLLTON CENTRAL PLAZA ASSOCIATES FEE OWNER, LLC, WARREN WASS, JEREMY MORITZ AND LANCE BUTCHER<br>Defendant. | * | MAGISTRATE JUDGE CURRAULT<br>A JURY IS DEMANDED |

* * * * * * * * * * * * * * * * * * * * * * *

Deposition of NEIL HALL, taken at the Law Offices of Simon, Peragine, Smith & Redfearn, 1100 Poydras Street, Suite 3000, New Orleans, Louisiana, on Thursday, the 5th day of February 2026, beginning at 10:57 a.m.

Reported by:

PAMELA M. MACDOWELL, CCR



EXHIBIT A

APPEARANCES:

RANNALS LAW, LLC
(By: Tracey Rannals, Esquire)
400 Poydras Street, Suite 900
New Orleans, Louisiana 70130
(504) 500-0517
tracey@rannalslawfirm.com

ATTORNEY FOR PLAINTIFFS

SIMON PERAGINE SMITH & REDFEARN
(By: Trevor C. Davies, Esquire)
1100 Poydras Street, 30th Floor
New Orleans, Louisiana 70163
(504) 569-2984
TrevorD@spsr-law.com

ATTORNEY FOR DEFENDANTS

INDEX

| | Page |
|---|---|
| APPEARANCES | 2 |
| AGREEMENT OF COUNSEL | 4 |
| EXAMINATION BY: | |
| Mr. Davies | 6 |
| Ms. Rannals | 67 |
| RE-EXAMINATION BY: | |
| Mr. Davies | 79 |
| EXHIBITS: | |
| Exhibit A | 22 |
| Photograph | |
| Exhibit B | 79 |
| Report | |
| Exhibit C | 79 |
| Curriculum vitae | |
| Exhibit D | 79 |
| Trial summary | |
| Exhibit E | 79 |
| Trials and Depositions | |
| Exhibit F | 79 |
| Rate sheet | |

WITNESS' CERTIFICATE 82
REPORTER'S PAGE 83
REPORTER'S CERTIFICATE 84

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties that the deposition of NEIL HALL is hereby taken under Article 1421 Et Seq. of the Federal Rules of Civil Procedure of the State of Louisiana, in accordance with law, pursuant to notice;

That the formalities, such as reading, signing, sealing, certification, and filing, are specifically not waived;

That all objections, save those as to the form of the questions, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * *

PAMELA M. MacDOWELL, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the above-named witness.

* * *

industry that led me to become the plaintiff guy.

Q. Since, roughly, 2010, which would have been some years after Katrina, you've been, like, 99 percent plaintiff work; is that true?

A. Yeah. 90 -- 90, 95. I don't bean count to tell you 99, but it's certainly up in that range.

Q. Can you tell me about your experience in designing parking lots for commercial buildings, if any?

A. I've never been the engineer who sat at the drawing board and designed the parking lot, but I've been in positions as the supervisory engineer where we reviewed those designs before they were sent out to contract, and I got involved in contract administration to have them built. That was during my military time.

Q. And when was the last time you were in the military?

A. 1992.

Q. And the design of speed bumps -- I mean, what's your experience in designing speed bumps?

A. I've never designed a speed bump. They're pretty much off-the-shelf items. In --

in checking and -- and signing off on drawings for parking lots, I've signed off on the placement of the speed bumps that were put in the parking lots.

Q. And what factors do you evaluate when talking about placement of speed bumps for a commercial building?

A. The importance of the placement is the purpose of the speed bump is to slow down the traffic. So, typically, you want to place it at the approach to an intersection, not in the middle of the intersection.

The middle of the intersection, it's too late to slow down the vehicle. You want the vehicle to slow down before it gets to the intersection.

Q. And that's an intersection in a parking lot?

A. Yes.

Q. And an intersection being defined as any place where cross traffic could occur?

A. Correct.

Q. And cross traffic, is that limited to vehicular traffic that's crossing, or could it also be pedestrian traffic?

A. June 19, 2024.
Q. And what were your instructions?
A. I was asked to review documents I would receive, including a video, and try to render an opinion deskside because repairs had already been done in the field.
Q. So "deskside," what does that mean?
A. It means I don't go to the field. I just rely on documents and photographs that I review at my desk.
Q. And you just testified that repairs had already been done in the field. What do you mean by that?
A. My understanding is that the speed bump had been relocated and moved to that new location; so it was a different speed bump.
Q. But you used the term, "repairs." What repairs --
A. Oh, I shouldn't have used the term "repair." To be more precise, it had been removed and replaced.
Q. Do you know who removed and replaced it?
A. No.
Q. And the key question that you were asked was whether the speed bump on October 15, 2022,

constituted an unsafe condition leading to the accident that Ms. Query had; correct?
A. Correct.
Q. How do you, in your years of experience and training, define the term "unsafe condition"?
A. An "unsafe condition" can be defined one of two ways. One, if there's an existing standard -- a consensus standard used within the safety industry that considers it to be unsafe. That's a standard. I'm not going to go against the standard.
I've had cases where the standard wasn't clear and I had to do other research and use my judgment to determine an unsafe condition. In this case, I was able to go by the standard.
Q. So you define, in the context of doing your forensic work that you were obtained to do in this case, the term "unsafe condition" thereby looking at an existing standard that applies to a condition or your own judgment; agree?
A. Yes. My own judgment, if it does not conflict with the standard. In other words, I only use -- my judgment only weighs in if the

parking lot?

A. That's correct. More or less the same principles, but you morph from a speed hump in a public roadway to a speed bump in a private setting.

Q. Are you familiar with the -- I guess the case law in Louisiana that is used to instruct jurors on how to decide whether something presents an unreasonable risk of harm?

A. No.

Q. No. Are you not aware that there's, like, a balancing test that considers the utility of a condition, the likelihood and magnitude of the harm posed by the condition, the cost of presenting that harm, and the nature of a plaintiff's activity? You're not familiar with that?

A. I don't use that. But now that you mention it, it has been discussed in other litigation cases I've been on.

Q. You focus solely on whether or not there's an existing standard that you can apply to a condition and say "This does not meet the standard, and it's -- therefore, it's unsafe"; that's what you do?

A. Yes.
Q. And you're using CONNECTExplorer and Google Earth to pull those; correct?
A. Correct.
Q. In connection with giving your opinions in this case, have you reviewed any other documents, evidence, photos, video, anything else?
A. No.
Q. I understand that you talked about standards. I mean, other than ASTM F1637-21, have you reviewed any other standards or code provisions or suggestions on safety in connection with rendering your opinions in this case?
A. No.
Q. And then the report was issued June 20, 2025, and it contained your conclusions based on the information that we just talked about. So you had an input, which is what we just talked about -- that evidence, photos, video, and the standards -- and you spit out that report. That's it; correct?
A. Well, I take "spit out that report" colloquially, but that's correct.

Q. So what is the definition of "walkway," under ASTM 1637-19, Section 33.1.13?

A. I don't have it off the top of my head. I noticed you had a copy. If I look at it, I can possibly tell you. I offhand --

Q. You looked at my notes?

A. Well, I can see it across the table.

Q. Well, it's not -- I don't have the definition printed. I'm asking you if you know. I don't think I have access to that.

A. I don't offhand. And offhand, I don't think -- unless I find it here -- I don't think it actually defines the term "walkway" itself.

Q. Okay.

A. It's presumed to be a surface on which a pedestrian can walk.

Q. And the City of New Orleans, where this Costco sits, has not adopted ASTM 1637-19 as a standard that commercial buildings and parking lots must adhere to; correct?

A. That's correct. It's not codified by ordinance in the city.

Q. Is it codified by ordinance or statute in the state of Louisiana?

A. No.

Q. Did you perform any analysis regarding which direction Ms. Query was looking at the time of her incident?
A. No.
Q. The jury will review this video, presumably, at the trial in this case; right?
A. Yes.
Q. And you have experience testifying in front of juries; correct?
A. Yes.
Q. And you're aware that juries are given instruction on the law and told to apply the law to the facts presented to them; correct?
A. Yes.
Q. You agree that the jury in this case will look at the photos, surveillance video, and make a determination about whether or not the speed bump presented an unreasonable risk of harm; correct?
A. That's my understanding, yes.
Q. Is there any special scientific methodology that you performed to weigh in on that question of whether or not the speed bump presented an unreasonable risk of harm?
A. Only in terms of the scientific method.

By "the scientific method," we look at the facts, we create hypotheses, and then we analyze the facts to determine which hypotheses is most likely.

In this case, it's either it did present a reasonable risk of harm or it didn't. I conclude it did.

Q. And what was the scientific methodology that you used to reach that conclusion?

A. Observation of the video, observation of the photographs, and review of the standards.

Q. Review of the standard being ASTM 1637; correct?

A. That's correct.

Q. Can you perform a calculation of the surface area of this particular parking lot, like how much ground there is of pavement? I mean, would you be able to do that? Can you do --

A. Of the -- dimensions of what?

Q. The parking lot. The whole parking lot. Would you be able to make that calculation given --

A. Yeah. You can scale that off an aerial photograph.

list of trials and depositions. And "Exhibit F," a copy of your fee schedule.

(THE DOCUMENTS WERE MARKED FOR IDENTIFICATION AND ENTERED INTO THE RECORD AS EXHIBITS B, C, D, E, F.)

BY MS. RANNALS:

Q. And just a general question: What is the purpose of the ASTM?

A. They establish protocols so that engineers, practitioners, safety experts -- we have standard methodology for testing and evaluation of both testing of materials and evaluation scenarios of different configurations of the built environment.

I'm sorry if that was befuddled. I've never been asked that particular question before.

Q. So -- strike that.

MS. RANNALS:

That's all the questions I have at this time.

RE-EXAMINATION

BY MR. DAVIES:

Q. Did you do any evaluation regarding how

many other falls there had been in this parking lot --

A. No.

Q. -- prior to Ms. Query's incident?

A. No.

Q. Do you have any information regarding how many pedestrians traverse the parking lot at Costco in New Orleans on a daily basis?

A. No.

Q. Yearly basis?

A. No.

Q. Probably hundreds of thousands; correct?

A. Oh, I presume so.

Q. But you didn't do any investigation into those numbers, did you?

A. No.

COURT REPORTER:

Read and sign?

THE WITNESS:

Please.

COURT REPORTER:

Ms. Rannals, do you need a copy of the transcript?

MS. RANNALS:

No.

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, Pamela M. MacDowell, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that NEIL HALL, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 83 pages; that this testimony was reported by me in the Stenomask reporting method, was prepared and transcribed by me or under my personal supervision, and is true and correct to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

IN WITNESS WHEREOF, I have affixed my official signature this 23rd day of February 2026, at New Orleans, Orleans Parish, Louisiana.

PAMELA M. MacDOWELL, CCR (#20077)